AO 91 (Rev. 11/11) Criminal Complaint

FILED
SEP -4 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT

for the

Northern District of California

United States of America
v.
Gerald Myint,

Defendant(s)

Case No. 3 19 71448

JCS

~~UNDER SEAL~~

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of August 14, 2017 in the county of San Francisco in the Northern District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

#1 WSK

Approved as to form:

WILLIAM FRENTZEN
Assistant United States Attorney

*Complainant's signature*

Janette Spring, Special Agent - FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/3/19

*Judge's signature*

City and state: San Francisco, California

Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Janette Spring, Special Agent with the Federal Bureau of Investigation ("FBI") being duly sworn, hereby depose and state as follows:

## I. INTRODUCTION

### A. SYNOPSIS

1. I submit this affidavit in support of a criminal Complaint for GERALD MYINT ("MYINT").

2. There is probable cause to believe MYINT, while employed as an internal medicine physician in Hayward, California, accepted kickback payments in exchange for patient referrals, in violation of 42 U.S.C. § 1320a-7b(b), the anti-kickback statute.

3. As part of this investigation, the Agents have obtained information from the cooperation of an FBI cooperating witness ("CW-1") [1] and evidence obtained by an FBI undercover employee ("UCE").

4. An identified co-conspirator informed the investigation that MYINT was a physician willing to accept kickbacks in exchange for patient referrals.

5. During the course of this investigation, UCE held multiple in-person audio and video recorded conversations with MYINT, in 2017 and 2018, in which MYINT receives kickback payments in exchange for the referral of patients and likewise facilitates the payment of kickbacks to co-conspirators.

### B. BACKGROUND OF LEGAL FRAMEWORK AND INVESTIGATION

6. Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b). The relevant language of the statute is listed

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services. However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation. As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased. These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA. A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship. CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer. The CW-1later falsely denied having possessed false identifying documents when interviewed by immigration officers. Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture. The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status. After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual. To my knowledge, those threats were never carried out. CW-1 is not currently the subject of any pending criminal charges.

below. In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care.[2]" FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice. Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services. The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring. Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.[3]

7. An undercover operation was selected as the means of investigating kickbacks. From training and experience, the investigators understood that health care providers and HHAs shrouded their activities in secrecy. Typically, health care providers were given kickbacks in the form of cash payments made in closed door meetings between themselves and HHA representatives. Some used bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually non-existent, services. Given the expected closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective. An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments

[2] "Kickbacks Among Medicaid Providers", Senate Report 95-320, 1977.

[3] In fact, throughout the course of the investigation, four of the targets, while negotiating kickback payment amounts, discussed similar "longevity" bonuses. UCE agreed to these bonuses or entertained further discussion to potentially identify any such referrals by proactively identifying at-risk patients. During the course of the investigation, no such longevity bonus referrals were made to the UCO.

8. Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area. One of the two agreed to serve as a cooperating witness ("CW-1"). CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks. UCE often communicated with targets in furtherance of the UCO while in San Francisco. The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

9. In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required. For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks. Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial introductions and to allowing the UCO to expand. The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies. Further, the care provided by the vetted HHA could be monitored and reviewed.

10. In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO. The FBI investigation was partly based upon analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a likely kickback offender. Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations. Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the

initiation of the UCO, Medicare received two complaints[4], which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency. Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care.[5] During the course of the UCO, there was one complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare through the duration of the UCO. During the course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA Alpha. At no time during their meetings with CW-1 and/or UCE did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been received. Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

### C. AGENT BACKGROUND

11. I am a Special Agent of the Federal Bureau of Investigation and have been so employed for approximately three years. I am currently assigned to the Complex Financial Crime Squad of FBI's San Francisco Field Division. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime. I have received specialized training in health

[4] An anonymous complaint filed in 2016 alleged a durable medical equipment kickback scheme, which was closed due to insufficient information. In 2015, Medicare closed a patient allegation of false billing by HHA Alpha after a review of documents provided by HHA Alpha justified the billing.

[5] Only three patients out of 129 interviewed by FBI complained and the complaints consisted of (1) early discontinuation of treatment, (2) a nurse should have shown up more often, and (3) physical therapy should have been longer. Of all patients referred to HHA Alpha by targets of the investigation during the UCO, the FBI was unable to interview 31 patients due to the patients passing away in hospice care or because the patients could not be located – generally international patients. As to those patients, no complaints regarding patient care were ever filed against HHA Alpha.

care fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims. I have participated in the execution of various arrests and search warrants in which business and personal documents, bank records, computers, and other evidence of fraud and other crimes have been seized.

12. In the course of this investigation and my investigation of other health care fraud schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3) read interviews and other reports written by other law enforcement officers; and (4) become familiar with the manner and means by which health care fraud schemes are operated including violations of 42 U.S.C. Section 1320a-7b and 18 U.S.C. Section 371.

13. This affidavit is intended to show merely that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Where excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

**D. COMPLAINANT**

14. MYINT, is a 68 year old male who is believed to reside in Union City, California. MYINT is an internal medicine physician with a medical office located at 27206 Calaroga Avenue, Suite 205, Hayward, California. During the course of the investigation, MYINT accepted kickback payments in the form of cash from UCE and CW-1 in exchange for the referral of home health and/or hospice patients to HHA Alpha.

**E. STATUTES VIOLATED**

15. **Title 42, United States Code, Section 1320a-7b(b)(1)(A)**, in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly, or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

**II. PROBABLE CAUSE**

**A. MYINT IS INTRODUCED TO UCE BY A CO-CONSPIRATOR**

16. Through CW-1's position with HHA Alpha, CW-1 became familiar with VINEETA SINGH ("SINGH"), Director of Social Work for Hayward Hills Health Care Center, a skilled nursing facility, located

in Hayward, California. CW-1 was aware SINGH was taking kickbacks for patient referrals, which were likely paid by AMITY HOME HEALTH CARE, INC. ("AMITY"). During the UCO, CW-1 and UCE met with SINGH who agreed to accept kickback payments in exchange for the referral of patients. SINGH also agreed to refer physicians to CW-1 and UCE who were willing to participate in a similar patient referral kickback scheme.

17. SINGH identified MYINT as a physician willing to accept kickbacks in exchange for patient referrals.

18. On or about May 24, 2017, CW-1 and SINGH exchanged text messages regarding the referral of physicians who might be willing to accept kickbacks in exchange for patient referrals. Set forth below is an excerpt of the text message exchange:

| Speaker | Statement | Additional Explanation[6] |
|---|---|---|
| CW-1: | . . . Do you know physician who would like to work with us | CW-1 is referring to physicians who would accept kickbacks for patient referrals. |
| SINGH: | Yes | |
| CW-1: | If so we can work something out | CW-1 is referring to paying SINGH for physicians she refers who are willing to accept kickbacks. |
| CW-1: | Who | |
| SINGH: | [Doctor 1] | |
| SINGH: | Gerald myint | |

19. On June 16, 2017, CW-1 and UCE visited MYINT at his office in Hayward, California. This meeting was audio and video recorded. During the meeting, MYINT asked CW-1 and UCE who referred them and they shared that SINGH provided the connection. CW-1 asked MYINT "Did she [SINGH] text you though? She said that she's texting you right now?" … "Okay, I wanna make sure we're on the same page." MYINT checked his text messages and responded to CW-1, "I can see. so I [MYINT] will know how to handle." UCE and CW-1 understood this to mean MYINT wanted to know whether or not he could openly discuss payment for patient referrals during the meeting.

[6] The "Additional Explanation" columns in this affidavit provide my summary opinion and/or explanation of the adjacent text in the "Statement" column. My summary opinion and/or explanation is based on my training and experience of the criminal statutes violated and of the UCO.

20. Following the meeting with MYINT, CW-1 placed a call to SINGH and discussed whether or not CW-1 should pay MYINT. This conversation was audio recorded. SINGH indicated she had already communicated with MYINT about payment. An excerpt of the conversation is below:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| CW-1: | Ok. So, did you talk to him already? | |
| SINGH: | I talked to him. | |
| CW-1: | So let him know that that um I'm dropping off an envelope for him. So he knows. Can you text him that? So, I don't wanna be off guard. | CW-1 mentions an envelope which contains cash. CW-1 asks SINGH if CW-1 should pay MYINT now for patient referrals. |
| SINGH: | But if he but if he didn't give you a patient, then why would you drop off an envelope? | CW-1 understood SINGH's statement to mean she acknowledges the envelope contains cash. SINGH is asking why CW-1 would pay MYINT prior to a patient referral. |
| CW-1: | So I gain his trust. Otherwise he will not give it to me. Why would why would you think he would give it to me? | CW-1 explains a payment in advance would gain MYINT's trust. |
| SINGH: | Does he have any, does he have any patient? | |
| CW-1: | He does. | |
| SINGH: | Which one? | |
| CW-1: | I don't know. He's coming down right now, so. He said he has a lot of patients and he will talk to you and he will probably meet me ah he's coming. I don't wanna talk to you in front of him or. | |
| SINGH: | Yeah, I told him already [unintelligible ("UI")] will take care of you. | I believe the statement "take care of" is referring to paying MYINT cash for the referral of patients. |

21. Following the conversation with SINGH, CW-1 contacted MYINT on his cellphone to discuss the payment "Cause Vineeta told me to go back inside and take care of you." This conversation was audio recorded. MYINT had already left his office so he asked CW-1 to return on Monday, June 19, 2017.

22. On June 19, 2017, CW-1 and UCE met with MYINT at his office. UCE discussed their business plan and told MYINT they wanted "to develop special relationships with doctors, trusting relationships with doctors." UCE asked MYINT, "so, I didn't know if that was something VINEETA [SINGH] sort of discussed with you or not?" MYINT replied, "Ya, she talked to me." Set forth below are additional excerpts from the meeting:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | Is something on the order of the first month, maybe two or three. | UCE requests MYINT to refer two to three patients within the first month that he begins to send referrals. |
| MYINT: | mmhmm | MYINT expresses understanding. |

| | | |
|---|---|---|
| UCE: | We know they can't all be Medicare. We'd like it to be more Medicare if possible. | "Medicare" is in reference to Medicare patient referrals. |
| MYINT: | Oh, of course. | MYINT expresses understanding |
| UCE: | You know, hospice pays a little bit more | "Hospice" is in reference to hospice patient referrals. |
| … | | |
| UCE: | We're happy to reward people for working for us at whatever level they're comfortable with | UCE explains they will pay MYINT for however many patient referrals he agrees to send to HHA Alpha. |
| MYINT: | mmhmm | MYINT expresses understanding. |
| UCE: | So we're hoping for two to three and um, we believe that if you're comfortable with that we have envelopes. | "Two to three" is in reference to patient referrals. "Envelopes" is in reference to cash kickback payments placed inside envelopes. |
| MYINT: | -laughs- | |
| UCE: | For you. Does that sound fair? | |
| MYINT: | Okay. | |
| UCE: | Okay, so does a thousand dollars for the first month for two to three sound fair? | UCE asks if $1,000 was enough money for two to three patient referrals for the first month. |
| MYINT: | This why you, because I needed to talk to VINEETA [SINGH], how she did usually, usually what we get we share to her, you know, equal to share. | I believe this statement to mean MYINT usually shared kickback payments with SINGH. |
| UCE: | Oh, oh, we already have a good relationship. | |
| MYINT: | Oh good relationship with her. | |
| UCE: | No, no, no, don't, we already have a good relation…this is just for you | UCE explains the kickback payment from UCE is intended only for MYINT and that UCE has a good relationship with SINGH and will pay her a separate kickback. |
| MYINT: | Okay for me. | MYINT agrees. |
| … | | |
| UCE: | But if you're good, if you'd like to maintain the two to three level, uh, we can come by on a monthly basis, and um, provide an envelope, and we'll be good. Does that sound fair to you? | |
| MYINT: | Okay, so how much? | |
| UCE: | A thousand for two to three? Does that sound okay for you? | |
| MYINT: | Uh, because I've been work like this with other home health too. | MYINT hesitates on the dollar amount discussed. I believe this statement means MYINT has existing kickback relationships with other HHAs. |
| CW-1: | So, if you think other companies are paying more, then let us know because we don't want to be [UI] either. | |
| UCE: | Right, if, if… | |
| CW-1: | Oh, so per head? | CW-1 asks MYINT if gets paid per patient referral |
| UCE: | Per head? Okay. So would you like us to give you… | |

| | | |
|---|---|---|
| MYINT: | I don't want to take, you know, the things I do, I don't want to accept your envelope without give, if I don't have patient, I feel guilty that I don't have a patient for your envelope, so I… | I believe this statement means MYINT does not want to get paid prior to making a patient referral. |

23. UCE, CW-1, and MYINT discussed the importance of keeping their kickback relationship confidential. CW-1 explained to MYINT, "We want to keep it confidential. This way because we don't want AMITY to know and everyone else start competing. Then the next thing we know it's a bidding war." MYINT agreed and disclosed that AMITY was paying him $1,000 per hospice or home health patient referral. MYINT, UCE, and CW-1 agreed to the rate of $1,000 per patient referral to HHA Alpha since AMITY was paying that amount. They also agreed to pay MYINT after he referred a patient instead of paying him a fixed amount every month, prior to him sending referrals. MYINT told CW-1 how he would inform CW-1 when he made a referral to HHA Alpha, "ya, so, if I have patient I refer to you, I would text you what kind of patient. You have the form, the referral form?" CW-1 stated he/she would give MYINT HHA Alpha's referral forms and asked MYINT to "just text me whenever you have a patient so we know it came from you."

**B. MYINT ACCEPTS KICKBACK PAYMENTS IN EXCHANGE FOR THE REFERRAL OF PATIENTS**

24. On August 12, 2017, CW-1 and MYINT exchanged text messages regarding one of MYINT's Medicare patients, who was being discharged from SINGH's facility. Set forth below is an excerpt of the text message exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| CW-1: | Good morning Boss.<br>Spoke with vaneeta from Hayward Hills and my office will be calling you to get verbal hospice orders for pt [patients name]. Pls approve and we will stop by and see you. Thx<br>[CW-1]<br>[HHA Alpha] | "We will stop by and see you" is in reference to CW-1 and UCE meeting with MYINT to pay him for the patient referral. |
| CW-1: | Thank you | |
| MYINT: | Yes, I already gave telephone order to RN –Serena. | "RN" is registered nurse. |
| CW-1: | Thank you again and will you be in the office as I am in Hayward and would love to pay a quick visit | "A quick visit" is in reference to CW-1 meeting with MYINT to pay him for the patient referral. |
| MYINT: | I ll be in the office until 12:00 noon. I'm just back from the meeting. | |
| CW-1: | Perfect will come see you first. | |
| MYINT: | ok | |

25. On August 14, 2017, CW-1 and UCE met MYINT at his office. This meeting was audio/video recorded. During the meeting, UCE paid MYINT $1,000 cash for the referral of the Medicare patient. Below is an excerpt of the conversation:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | Excellent. Excellent. So ah we just wanted to stop by, real quick, and say thank you | "Thank you" refers to the envelope of cash that UCE brought to give to MYINT as a kickback for the patient referral. |
| MYINT: | Oh no problem | |
| … | | |
| MYINT: | Anyone is ok right? Even in another home? In home health? | MYINT asks if UCE wants another home health patient referral. |
| CW-1: | Any anywhere. Yeah. | CW-1 explains any patient referral is okay, home health or hospice. |
| MYINT: | Home Health [UI] is ok. | |
| CW-1: | Yeah | |

26. Following this meeting, MYINT continued to communicate with and participate in the kickback scheme with UCE and CW-1. During the course of the UCO, MYINT met with CW-1 and/or UCE on at least five occasions, during which, MYINT accepted cash in exchange for patient referrals to HHA Alpha. In total, MYINT accepted $3,000 in cash from UCE and attempted to refer three patients to HHA Alpha.

**C. MYINT ADMITS TO RECEIVING KICKBACKS IN EXCHANGE FOR PATIENT REFERRALS TO AMITY**

27. On February 13, 2019, MYINT was interviewed by Special Agents of the FBI. During the interview, MYINT admitted to receiving kickback payments from AMITY beginning in 2015 for the referral of home health patients to AMITY. MYINT admitted to receiving kickback payments between $250 per patient referral to upwards of $6,000 per month, through at least the year of 2017.

28. According to Medicare claims data received from HHS-OIG, between January 10, 2015 and November 8, 2018, MYINT referred approximately 191 patients to AMITY. In turn, AMITY received approximately $1,090,018 from Medicare for these patients.

**III. PROBABLE CAUSE FOR THE VIOLATION**

**A. TITLE 42 UNITED STATES CODE, SECTION 1320A-7B(B)(1)(A), THE ANTI-KICK BACK STATUTE**

29. Title 42, United States Code, Section 1320a-7b(b)(1)(A), in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or

rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

30. Based on all of the foregoing, probable cause exists to believe that MYINT accepted kickback payments from UCE that were intended to induce MYINT to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

31. Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by MYINT for home health or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(1)(A).

32. Therefore, there is probable cause to believe that patient referrals sent to HHA Alpha by MYINT in exchange for cash payments from UCE meets the definition of a kickback payment and violates anti-kickback statute.

**IV. CONCLUSION**

33. Based on the foregoing, there is probable cause to believe MYINT accepted payments of kickbacks in exchange for patient referrals, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A).

**V. REQUEST FOR SEALING**

34. Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect.

//

//

//

//

//

//

//

//

Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related documents be sealed until the further order of this Court.

Janette Spring, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this 3rd day of September, 2019.

HON. JOSEPH C. SPERO
United States Chief Magistrate Judge